Olmsted v. Proprietors of the Morris Aqueduct.

STATE, HENRY M. OLMSTED, PROSECUTOR, v. THE PRO-
PRIETORS OF THE MORRIS AQUEDUCT ET AL.

1. The Proprietors of the Morris Aqueduct have power, through condem-
nation, to take lands and divert streams of water to such extent as may
be necessary to carry out the purposes of incorporation, and, in so
doing, are not confined to the territory stated in the act of 1862.
2. The said incorporation, under the act of 1883, has power to extend its
mains and to supply water outside the corporate limits of Morristown.
3. To supply a city or town with water is a public purpose for a public
benefit.
4. The diversion of the waters of a spring or stream should not be allowed
unless clearly necessary for the public good, and the question of neces-
sity should be controlled by the court, and there should be satisfactory
evidence of the need.

On *certiorari*.

Argued at June Term, 1884, before Justices KNAPP,
DIXON and PARKER.

For the prosecutor, *Theodore Little*.

For the defendants, *Alfred Mills* and *Henry C. Pitney, Jr.*

The opinion of the court was delivered by

PARKER, J.   On the 2d day of June last, application was
made to one of the justices of the Supreme Court by " The Pro-
prietors of the Morris Aqueduct," setting forth that the peti-
tioners deemed it necessary, were desirous, and had determined
to add to and enlarge their works, and thereby increase their
facilities for furnishing water to Morristown by taking and
diverting certain streams described as follows, viz.: first, all
the waters of a certain spring called " Sand Spring," being on
lands belonging to the Proprietors of the Morris Aqueduct, on
the southwest side of the road running from the Brick school-
house to New Vernon; second, so much of the water of a
certain rivulet called " Mills Bailey Brook," which crosses

the road leading from Morristown to Baskingridge, near the Brick school-house, as rises to the northwest of a point in the bed of said rivulet, eight hundred feet in rectangular measurement, northwesterly from the middle of said road leading from Morristown to Baskingridge; and further stating that said waters at present flow down to and upon the grist-mill and lands of Henry M. Olmsted, the said lands containing about one hundred and sixteen acres, and that said grist-mill and lands are occupied by William Stull and Frederick Stull, as tenants of said Olmsted.

The application prayed for the appointment of three commissioners to assess and ascertain the amount of damages to be done to said lands, and of compensation to be made to said Olmsted and others, for the perpetual right and privilege of forever taking and diverting away from the said lands and grist-mill and said mill property the said waters, for the purpose aforesaid, and whatever the commissioners were authorized or required by law to assess or ascertain.

The commissioners having been appointed for the purpose set forth in the application, Mr. Olmsted obtained a *certiorari* to bring the proceedings here, to test their validity.

The prosecutor has filed the following reasons for setting aside the appointment of commissioners, viz.: first, because the Proprietors of the Morris Aqueduct can exercise the power of eminent domain only so far as is necessary to supply Morristown with water; second, because, if there be need of more water, they are required by law, first, to take the springs and streams having origin, or running, or being, to the westward of Morristown and between the road from Morristown to Baskingridge and the road from Morristown to Mendham, and that the water which they seek to divert is not within such territory; third, because said Proprietors of the Morris Aqueduct have extended their water-pipes outside of Morristown, and supply persons living outside; fourth, because the law under which they have proceeded is not constitutional.

In order to determine the legality of the proceedings, it will be necessary, first, to examine the several acts of the legis-

lature applicable to the corporation known as "The Proprietors of the Morris Aqueduct."

The original act of incorporation was passed on the 16th day of November, 1799. That act did not give power to acquire land or water-rights by condemnation.

By a supplement passed on the 17th day of February, 1862, authority was given to take and divert any spring or springs, stream or streams of water having their origin, running or being to the westward of the village of Morristown, and between the direct road leading from Morristown to Baskingridge, and the direct road or turnpike leading from Morristown to Mendham, and to lay down, maintain and repair pipes, &c.

The third section of this supplement provides that if the said corporation could not agree with the owner, or person interested in any land which said corporation might desire to use and occupy, or from which they might desire to take or divert, either in whole or in part, any spring or springs, stream or streams, for the purpose aforesaid, as to the amount of compensation to be paid to such owner, for any such use, occupation or diversion, that application could be made to any judge of the Court of Common Pleas of the county of Morris to appoint commissioners to assess and ascertain the amount of damages to be done to said lands by the erection and maintenance of works, and by the total or partial diversion of said springs and streams of water.

The fifth section of the same supplement gave to the party who may have considered himself aggrieved by the assessment and award of the commissioners, the right to appeal to the next or the second term thereafter of said Court of Common Pleas, and in that court was vested the power to hear and determine the appeal, or, if required, to award a *venire* for a trial by jury.

The next law on the subject was passed on the 21st of April, 1876. It is a general law, providing for the construction, maintenance and operation of water-works, for the purpose of supplying cities, towns and villages of this state with

water. The fifteenth section provides that any aqueduct company then in existence under any special charter in this state, should have the right, from time to time, to add to and extend their works to such extent as might be necessary to carry out the purposes of its corporation, and for such purposes to take all such lands and divert all such streams of water as' should be necessary for that purpose, in the manner as in such act was provided.

The fifth section enacts that application shall be made to a justice of the Supreme Court to appoint commissioners to ascertain the value of the lands proposed to be taken, used or occupied, and the damages to be done any lands, by the diversion total or partial, of springs of water.

On the 23d day of March, 1883, an act was passed making it lawful for any aqueduct or water company, organized under the general law or specially chartered, for the purpose of supplying any city, borough or town with water, to extend its mains outside and beyond the corporate limits of such city, borough or town, along any road or street leading therefrom, for the purpose of supplying the dwellers along such road or street with water.

By an examination of the above extracts it will be seen that express power to take lands and divert springs and water courses by condemnation, through commissioners to be appointed by a justice of the Supreme Court, has been given. It will also appear that power has been given to take lands and divert water from springs or streams having their origin, running or being outside of the territory limited by the law of 1862. The language of the law of 1876 clearly authorizes any aqueduct company then in existence, from time to time to add to and extend their works to such extent as might be necessary to carry out the purposes of its incorporation, and for that purpose to take by condemnation all such lands and divert all such streams of water as should be necessary for that purpose. There is no force in the assertion that before the power to take by condemnation is exercised outside the limited territory, the Proprietors of the Morris Aque-

duct must first take all the springs or streams within the limits defined in the act of 1862. The law of 1876 makes no such exception or condition, nor can such construction be drawn from any of the acts on the subject.

It is not necessary to consider the arguments of counsel on the question of the boundaries of Morristown as a community under township government, when the original act of incorporation of the Proprietors of the Morris Aqueduct and the supplements before the creation of the present municipality were passed. The act of 1883 expressly authorizes the extension of mains and the supplying of water outside the corporate limits, and therefore the objection to the proceedings, on the ground that some persons outside of Morristown may be supplied, cannot prevail.

It is said, further, that the proceedings to appoint commissioners are invalid, because the laws under which they are taken are unconstitutional. It is alleged that the unconstitutionality of these laws consists in their authorization of the taking of lands and diverting of water by condemnation not for public use. The original charter and all the laws which are applicable to the subject are based on the ground of public use. If the supplying of a city or town with water is not a public purpose, it is difficult to conceive of any enterprise that could be classed under that head. The opinion of the Court of Errors and Appeals, delivered in the case of *Tide Water Company* v. *Coster*, reported in 3 *C. E. Green* 518, seems to me to dispose of this question. The opinion of Chancellor Walworth, in 3 *Paige* 73 (*Beekman* v. *Saratoga, &c., R. R. Co.,*) which is quoted by the Chief Justice in the Tide-water case, is to the effect that if the public interest can be promoted by the taking of private property, it rests with the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient to authorize an interference with the private rights of individuals for that purpose, and the exercise of the right of eminent domain. "Upon this principle of public benefit," says Chancellor Walworth, "not only the agents of the government, but also individuals and corporate bodies have been

authorized to take private property for the purpose of making public highways, turnpike roads and canals, establishing ferries, draining swamps and marshes, and of bringing water to cities and villages."

In remarking upon the above language of Chancellor Walworth, the Chief Justice in the Tide-water case says it embodies the correct principle, and that "the legislative power is not competent to take the property of A and transfer it to B, simply for the benefit or convenience of B, because such an act has no public aspect." "But if the sequestration of the property of A will to a material extent be serviceable to the public at large, whether such sequestration shall take place, must be committed as a pure matter of discretion to the legislature, provided such discretion be exercised in good faith."

The only remaining question is that which relates to the necessity of taking and diverting under condemnation proceedings the spring and rivulet mentioned in the application and appointment of commissioners. It is urged on the part of the prosecutor that the Proprietors of the Morris Aqueduct already have sufficient facilities to supply Morristown with water, and that the present facilities will furnish an adequate supply for several years. If this be so, the proposed condemnation should not be permitted. The diversion of the waters of a spring or stream from a farm, or a mill-seat, should not be allowed even upon liberal compensation, unless obviously necessary for the public good. The legislature has given power to divert such waters when necessary, but it is not for the corporation interested to determine the necessity. As the question of necessity lies at the foundation of the proceedings to condemn, and as the power sought to be exercised is great, it should be kept in control by the court before which the question arises, and the court should be entirely satisfied of the need.

In determining the question of necessity the object of the laws applicable to this corporation should be noticed. The object is to furnish water to the people of Morristown. Morristown is a growing municipality, covering a large extent of

territory, and containing about six thousand inhabitants. Improved facilities for rapid transit have brought the town so near New York that it may almost be called a suburban town. The number of permanent residents is rapidly increasing. Spacious houses are multiplying. The population is of such a character as to demand those conveniences and comforts of life developed by what are termed " modern improvements." To retain such a population an abundance of pure spring water is essential.

A company that undertakes to supply a city or town with water does not perform its duty to the public unless it provides, not only for ordinary seasons, but for long summer droughts. Provision must be made in advance for such contingencies, for when the drought shall come it will be too late to apply a remedy. To make sure that a water famine shall not exist for even a single week, it is necessary to anticipate the condition of things which experience teaches will frequently occur, and in time make provision by increased facilities to supply water abundantly at a period when it shall be most needed. Not only does the comfort of the inhabitants demand this, but their health as well. It is well known that when a company undertakes to supply a town with water the ordinary methods to obtain water to extinguish fires are abandoned by the people, and under such circumstances it would be gross negligence in the company to permit the supply of water to be intermitted or diminished to any considerable extent, and thus endanger the property within the town.

The evidence proves that the Proprietors of the Morris Aqueduct have always been alive to the importance of the enterprise in which they have embarked. To meet the public demand and requirement they have, from time to time, condemned and diverted springs and streams of water to their use, and turned the same into their mains and pipes in Morristown. A portion of the water thus supplied has been stored for a season in reservoirs to meet extraordinary demands, and the residue has found its way to the proper receptacles by gravity. The testimony shows that the effort of the aqueduct com-

pany has been not only to supply an abundance of water, but to have it pure and wholesome spring water. Surface water has been as far as possible rejected. And this consideration enters largely into the question of the necessity of diverting the waters of the spring and the rivulet described in the condemnation proceedings. The waters thus sought to be used are of better quality than any within reasonable distance of the town.

The president of the aqueduct corporation, who has made the subject a study, and has watched the enterprise for many years through various stages, says in his testimony that the consumption of water has increased much more rapidly than the population. He thinks that the consumption in three years has increased from thirty to fifty per cent. It also appears from his evidence that the consumption is greatest when the water is scarcest. His calculation is that the consumption about doubles in the summer months. He says that in 1881 the summer was dry, and at the end of the drought they were nearly out of water, and if the drought had continued ten days longer they would have been on short rations. He also says that since that time the consumption has greatly increased, and he gives it as his opinion, after stating his reasons therefor, that if there should be another dry season anywhere near as dry as that of 1881, they would be short of water.

The fact that the Proprietors of the Morris Aqueduct own a small mill authorized by the act of the legislature of March 14th, 1832, to which some of the water flows, does not change the character of the corporation. It is still under charter for a public purpose.

Nor does the small quantity of water flowing to the mill, exclusive of that which must run away in rainy seasons in the overflow, affect the question of necessity. It is clear that the diversion of the water applied for would be needed to supply Morristown with water should the mill go unused.

That the application for the appointment of commissioners is made in good faith is proved by the fact that the Proprietors of the Morris Aqueduct have already expended a large

sum of money in purchasing and laying pipe preparatory to acquiring the right to divert the waters applied for, as well as by the fact that large additional expense must follow the condemnation.

The appointment of commissioners must stand and the *certiorari* be dismissed.